Earl C. Knight et al., Respondents, *v.* Presbytery of Western New York, Appellant.

Fourth Department, May 19, 1966.

*Brown, Kelly, Turner, Hassett & Leach* (*John E. Leach* of counsel), for appellant.

*Willett & Wallace* (*Charles D. Wallace* of counsel), for respondents.

*George Wilson McKeag* for William P. Thompson and another, individually, as members of the United Presbyterian Church in the United States of America, and as Moderator and Stated Clerk, respectively, of the General Assembly of said Church, *amici curiæ.*

Bastow, J.    This appeal presents as the basic issue the extent courts may intrude into or interfere with the temporal affairs of a religious corporation at the instance of certain dissatisfied members thereof.   Plaintiffs, who are elders in churches within the district of defendant, seek to permanently restrain the latter from expending some $35,000.

Special Term granted temporary restraint, denied defendant's motion to dismiss the complaint and ordered a trial of the issue presented by plaintiffs that the expenditure would violate the provisions of section 5 of the Religious Corporations Law.   This statute, so far as here material, mandates that the trustees of a religious corporation shall administer its temporalities and property " in accordance with the discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject ".

In 1962 an interdenominational religious group (Regional Church Planning Board) made a sociological study of the so-called near east side of Buffalo which revealed an under-privileged and impoverished area having some 80,000 people. This resulted in a proposal to bring a community organizer to the area.   In 1964 the National Missions Department of defendant recommended for inclusion in defendant's 1965 budget the sum of $5,000 to assist in the implementation of the pro-posal.   In February, 1965 a special meeting of defendant was held at which the subject was fully debated.   A resolution was adopted that defendant support the effort to bring an organizer to Buffalo.

Thereafter and in March, 1965 the sum of $5,000 (together with a like amount from another source) was paid by defendant to East Side Community Organization, Inc.   The latter is a nonprofit membership corporation organized to promote and encourage in the east side of Buffalo better housing standards and good citizenship and to provide social and recreational facilities and services for members and families of a community organization.

Subsequently and in June, 1965 a scheduled meeting of defend-ant was called to act upon a proposal to grant an additional $30,000 for the support of this project.   The temporary restraint contained in a show cause order of June 3, 1965 and continued in the order appealed from has prevented such action.

Broadly speaking, religious organizations may be divided into two groups — congregational and hierarchical churches, respectively. A congregational church is an independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government. (*Watson* v. *Jones*, 13 Wall. [80 U. S.] 679, 724.) '' Hierarchical churches may be defined as those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head.'' (*Kedroff* v. *St. Nicholas Cathedral*, 344 U. S. 94, 110.)

The Presbyterian Church falls into the latter category. '' The radical principles of Presbyterian Church government and discipline are : That the several different congregations of believers, taken collectively, constitute one Church of Christ, called emphatically the Church; that a larger part of the Church, or a representation of it, should govern a smaller, or determine matters of controversy which arise therein.'' (The Constitution of The United Presbyterian Church, 1965–66, p. 120.) '' There are in the Presbyterian system of ecclesiastical government, in regular succession, the presbytery over the session or local church, the synod over the presbytery, and the General Assembly over all. These are called, in the language of the church organs, ' judicatories ', and they entertain appeals from the decisions of those below, and prescribe corrective measures in other cases.'' (*Watson* v. *Jones, supra,* p. 727.)

Special Term, as stated, concluded that a triable issue was presented as to whether or not the proposed use of funds would be an administration thereof contrary to the '' discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject '' in violation of section 5 of the Religious Corporations Law.

It has been written that the primary purpose of this enactment was '' to provide for an orderly method for the administration of the property and temporalities dedicated to the use of religious groups and to preserve them from exploitation by those who might divert them from the true beneficiaries of the trust. Prior to 1875, when the Legislature provided for denominational control of the temporalities of religious corporations, the majority of the members of a religious corporation could change its denominational character and devote the church property to an entirely different religious faith than that for which it was originally dedicated [citing cases]. For the public good, the Legislature decreed that the trustees of religious corporations, irrespective of the wishes of the majority of the local congre-

gation, must administer the temporalities in accordance with the discipline, rules and usages of the ecclesiastical body, if any, to which the corporation was subject. (Religious Corporations Law, § 5).'' (*St. Nicholas Cathedral* v. *Kedroff,* 302 N. Y. 1, 29–30, revd. on other grounds *sub nom. Kedroff* v. *St. Nicholas Cathedral,* 344 U. S. 94.)

But upon the facts here presented consideration must be given to a legal principle applicable to an hierarchical church enunciated in *Watson* v. *Jones* (13 Wall. [80 U. S.] 679, 727, *supra,* [and reaffirmed in *Kedroff* v. *St. Nicholas Cathedral,* 344 U. S. 94, *supra*]) as follows: '' In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.''

We do not conceive the issue before us to be whether or not there is proof that the General Assembly of the United Presbyterian Church — the highest ecclesiastical governing body — has specifically approved this project in Buffalo but rather whether the use of church funds for such a purpose as a church custom or usage has been passed upon and approved by the highest of these church judicatories. We find ample proof in the record that it has done so.

The basic issue as framed by the complaint is that the proposed use of the funds would be a diversion thereof from the trust purposes for which they were originally donated which were, according to plaintiffs, '' to promote the promulgation or teachings of the doctrines and tenets '' of the Presbyterian Church. There is conclusive factual proof, however, that for many years such doctrines and tenets have extended beyond the religious views of the members of this faith and the conversion of others thereto.

There is evidence that the church has been engaged in purposeful social action to help people without regard to religious affiliations to make better lives for themselves. Thus, some one hundred settlement houses or neighborhood projects are maintained where there is no emphasis on the teaching or promulgating of the tenets or doctrine of this church. Similarly, colleges and schools are maintained in countries of the Middle

East where it is illegal to teach the Christian gospel or to attempt to convert.

More specifically, the General Assembly shortly before the commencement of this action embraced a statement of policy adopted by the Board of National Missions which, among other things, supported " action which deals with the fundamental ills of modern life, particularly the uneven distribution of such fundamental needs as education, employment, and housing, rather than action which deals only with symptoms of social failure."

These then are the customs and usages of the church in the area with which we are concerned. Plaintiffs have submitted no proof to the contrary. We find no triable issue. Any attempt by a secular court to decide the issue in favor of plaintiffs would constitute in substance a reversal and disapproval of an issue within the cognizance of an ecclesiastical tribunal upon which it has made a decision. This the courts may not do. There exist " a spirit of freedom for religious organizations, an independence from secular control or manipulation — in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." (*Kedroff* v. *St. Nicholas Cathedral*, 344 U. S. 94, 116, *supra*.)

The order should be reversed and the complaint dismissed.

WILLIAMS, P. J., GOLDMAN, DEL VECCHIO and MARSH, JJ., concur.

Order insofar as appealed from unanimously reversed, without costs of this appeal to either party and motion to dismiss complaint granted, without costs.