Opinion issued June 8, 2006








     


In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00786-CV




BASIL GREANIAS, JAMES F. BELLOS, ARGO GEORGANDIS, CHRIS A.
NICKOLAS, GUS E. PAPPAS, JAMES S. PAPPAS, SPIRO J. PAPPAS,
PETER J. PETKAS, FRAN A. POND, and BRUCE ROLLINS, Appellants

V.

METROPOLITAN ISAIAH, FATHER GABRIEL KARAMBIS, SPYROS
CATECHIS, VASSO JACOMIDES, CHRIS KAITSON, A.J. KANTALIS,
THEODORE X. KOINIS, NICOLAS KYRIAZIS, CONSTANTINE S.
LIOLLIO, RICHARD MCGEE, SOFIA PETROU, MARTHA
STEFANIDAKIS, and JOHN ZAVITSANOS, Appellees




On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 2003-62548




MEMORANDUM OPINION

          This is a suit to determine the rightful board of trustees, or parish council, of the
Annunciation Greek Orthodox Cathedral in Houston, Texas (“the Cathedral”). 
Appellants, Basil Greanias, James F. Bellos, Argo Georgandis, Chris A. Nickolas, Gus
E. Pappas, James S. Pappas, Spiro J. Pappas, Peter J. Petkas, Fran A. Pond, and Bruce
Rollins (collectively, “appellants”)—parishioners of the Cathedral and members of its
parish council until removed by appellee Metropolitan Isaiah, the hierarch of the
regional division of the Greek Orthodox Archdiocese of America (“the Archdiocese”)
in which the Cathedral sits—appeal from the granting of a motion to dismiss their
claims for want of subject-matter jurisdiction. We determine whether appellants’
claims concerned the type of ecclesiastical matters that the First and Fourteenth
Amendments of the United States Constitution preclude courts from determining. See
U.S. Const. amends. I, XIV. Answering this question in the affirmative, we affirm
the judgment of the trial court.
Standard of Review
          In deciding a plea to the jurisdiction, a trial court considers the plaintiff’s
pleadings and any evidence pertinent to the jurisdictional inquiry. See Bland Indep.
Sch. Dist. v. Blue, 34 S.W.3d 547, 554–55 (Tex. 2000); see also Tex. Natural Res. 
Conservation Comm’n v. White, 46 S.W.3d 864, 867–68 (Tex. 2001). We review de
novo a trial court’s ruling on a jurisdictional plea, construing the pleadings in the
plaintiff’s favor and looking to the pleader’s intent. See Tex. Natural Res. 
Conservation Comm’n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002); Tex. Ass’n of Bus.
v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993).
Background
          The background facts are based on the following items that were before the trial
court when it ruled:
●allegations in appellants’ petition, viewed in the required light;
 
●exhibits to appellants’ prior and current petitions


 and to their
reply to the motion to dismiss, which exhibits the trial court’s
judgment recited that the court had considered; and
 
●information concerning the structure and history of the Greek
Orthodox Church in the United States and of certain of its
regulations, taken from the Archdiocese’s official website, of
which the trial court appears to have taken judicial notice below.




          The Cathedral was organized as a Texas non-profit corporation in 1917. The
Cathedral filed its first by-laws in 1970 and twice amended them, the last time in 1997. 
Until the time of appellants’ removal from the board of trustees, the Cathedral had
adopted its own by-laws (“the local by-laws”), rather than having adopted the
Archdiocese’s Uniform Parish Regulations (“UPRs”), as the Archdiocese and
Metropolitan Isaiah had requested that the Cathedral do. In fact, appellants alleged
that the Cathedral had expressly rejected adopting the UPRs in 1965.
          In the Cathedral’s annual December elections for 2000, 2001, and 2002, the ten
appellants, plus five others, were elected to three-year, staggered terms on the
Cathedral’s board of trustees, also known as the parish council. We refer to this board
of trustees as “the original parish council” in this opinion. In 2002, appellants Basil
Greanias (President), Gus Pappas (Vice President), Fran Pond (Secretary), and Spiro
Pappas (Treasurer) were elected by the original parish council to the offices indicated
in the parentheticals beside their names. 
          The strife underlying this lawsuit began in approximately 2001, with the
appointment of Father J. Gabriel Karambis as pastor, or Proistamenos, of the
Cathedral. Appellants produced, in the form of exhibits to their petition,
correspondence and documentation that supported their view that Father Karambis had
an inappropriate and negative leadership style, that many Cathedral parishioners were
unhappy with his leadership, and that the original parish council could not work with
him, despite its best efforts to do so. In contrast, appellees relied on correspondence
and documentation, attached to appellants’ petitions, supporting their view that
appellants had prejudged Father Karambis, that they had been unwilling to work with
him from the beginning and had made his removal their agenda, and that many
parishioners supported Father Karambis.
          Appellants presented their complaints concerning Father Karambis to the
hierarch for the Metropolis of Denver, appellee Metropolitan Isaiah, during 2002 and
2003.


 The Metropolitan rejected their calls to remove Father Karambis from active
duty. In his letters rejecting appellants’ request, Metropolitan Isaiah noted that (1) the
original parish council was not serving the parishioners’ desires; (2) the original parish
council members had “broken their oath of office” by, for example, following their
“personal agendas,” allowing his requests for the council to work with Father
Karambis to “f[a]ll on deaf ears,” and failing to create a by-laws committee, as he had
requested, to adopt the UPRs; and (3) one of the appellants, Spiro Pappas, acting as
the Cathedral’s treasurer, had deducted funds from the Cathedral’s financial
commitment to the Archdiocese for monies that Father Karambis allegedly owed to
the Cathedral. The Metropolitan also criticized one of the original parish council
members for having written him a “hat[eful]” and “venom[ous]” letter criticizing him
for having appointed Father Karambis and referring to the Cathedral’s financial
commitment to the Archdiocese as a “franchise fee” paid for the right to use the
Diocesan emblem. Additionally, Metropolitan Isaiah refused to ratify the elections of
the original parish council members who had been elected in December 2002 because
Father Karambis had refused to sign the election results, as required by the local by-laws, for reasons including the failure to adopt the UPRs’ requirements concerning
nominations and the failure to pay the full Archdiocesan commitment. 
          In February 2003, Metropolitan Isaiah demanded that the original parish council
members with uncompleted terms submit their resignations so that he could form an
interim council “until the anger, the criticism, and the animosity are quelled, and
sensibilities come forth for the good of the parish and its people.” Later that month,
when only three of the original parish council members (not appellants) resigned,
Metropolitan Isaiah rescinded his ratification of the remaining original parish council
members’ elections. In explaining how these members of the original parish council
had broken their oath of office, the Metropolitan stated:
[T]he oath of office that was taken with hands upon the Holy
Gospels and before God was that they would uphold “the discipline and
regulations of the Greek Orthodox Archdiocese.” This discipline
includes trusting the priest in the work that he does in the parish. Can
you honestly say that Father Karambis has been trusted as your
proistamenos, when he was followed by a private investigator, and when
the IRS was notified on two occasions regarding his personal finances? 
Do you call this trusting the priest? These were diabolical acts that only
Satan could conjure up in the minds of those who committed such sins!
 
If there is no trust in the priest, then the parish discipline has
broken down and then there is no cooperation between the priest, who is
head of the parish . . . , and the parish council. Can anyone of you deny
this? It does not take a rocket scientist to see that there is no working
cooperation between the spiritual head of the parish and those who took
the oath to assist him in his work.
 
. . . .
 
Finally, you as a council have totally ignored my requests to you
to change your local by-laws so that they would conform to the
Archdiocese UPR[s]. You preferred to ignore the fact that our Church
is hierarchical and that the head of the Church is our Lord Jesus Christ
Who is represented by each and every bishop and not council members
who must be ratified before they can serve on a council.



          In approximately March 2003, the Metropolitan and Father Karambis organized
an interim parish council, including the three members of the original parish council
who had resigned, and that council elected officers and assumed control. In response,
appellants circulated a petition, signed by over 300 parishioners, requesting that a
general assembly be called to address the original parish council’s removal. The
Metropolitan declared the meeting to be “out of order.” The meeting was nonetheless
held, and the attendees passed a resolution requesting that the Metropolitan retract his
dismissal of the original parish council. Metropolitan Isaiah rejected this request.
          In November 2003, appellants sued Metropolitan Isaiah, Father Karambis, and
the other appellees,


 seeking a declaratory judgment that
●the Cathedral’s by-laws were “the controlling document regarding
governance of the affairs of the [Cathedral]”;
 
●the Cathedral’s 2000, 2001, and 2002 board elections “were
appropriate and in conformity with applicable law and the By-Laws”;
 
●appellants violated the Cathedral’s by-laws in removing the
original parish council members and appointing an interim parish
council, and, thus, their actions in doing so were null and void;
and
 
●only the “duly elected Board of Trustees” (principally, appellants)
had authority to serve and to act on behalf of the Cathedral and,
therefore, that the board (the original parish council) had to be
reinstated.

          The parties’ briefing below indicates that none of appellants stood for election
in December 2003.
          Appellees moved to dismiss appellants’ claims for lack of subject-matter
jurisdiction. After a hearing that appears to have been unrecorded, the trial court
granted the motion and dismissed appellants’ suit. In its dismissal judgment, the trial
court recited:
The Plaintiffs assert claims concerning the administration of the
Cathedral including their purported removal as trustees. . . . [I]t is
apparent that the Cathedral is a Parish within the Metropolis of Denver
in the Greek Orthodox Archdiocese of America and, as such, is within
the Greek Orthodox Church. It is likewise apparent that the Greek
Orthodox Church is a hierarchical religious body. This Court is therefore
without jurisdiction to hear disputes involving the Cathedral that, like
those presented in the Plaintiffs’ pleadings, implicate matters of
discipline, faith, internal organization, or ecclesiastical rule, custom, or
law.
 
The trial court denied appellants’ motion for new trial.
Discussion
A.      The Basis of Appellants’ Complaints
          The allegations underlying appellants’ requests for declaratory relief can be
summarized as follows:



●Under the Texas Non-Profit Corporation Act (“TNPCA”),


 the
local by-laws controlled the Cathedral’s governance. Those by-laws provided, as did the TNPCA, that the Cathedral would be
governed by the board of trustees, here, the parish council. See id.
art. 1396–2.14, § A (Vernon 2003).
 
●Under the local by-laws, Metropolitan Isaiah did not have the
power to dismiss the original parish council.
 
●Under the local by-laws, Metropolitan Isaiah and Father Karambis
could not create an interim parish council in the manner in which
they did.
 
●Only the original parish council, rather than either the interim
parish council or the parish council elected in December 2003, had
the right to serve and to act on behalf of the Cathedral.
 
B.      The Law
          Under the First Amendment, “civil courts are prohibited from deciding
theological matters, or interpreting religious doctrine . . . .” Harvest House Publishers
v. Local Church, No. 01-04-00231-CV, 2006 WL 23548, at *3 (Tex. App.—Houston
[1st Dist.] Jan. 5, 2006, no pet.); see U.S. Const. amends. I, XIV. The First
Amendment’s Free Exercise Clause is the source of this prohibition. See, e.g., Kedroff
v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116,
73 S. Ct. 143, 154–55 (1952); Tran v. Fiorenza, 934 S.W.2d 740, 743 (Tex.
App.—Houston [1st Dist.] 1996, no writ). So is its Establishment Clause. See Turner
v. Church of Jesus Christ of Latter-Day Saints, 18 S.W.3d 877, 892 (Tex.
App.—Dallas 2000, pet. denied). Because of this prohibition, “‘the First Amendment
severely circumscribes the role that civil courts may play in resolving church property
disputes.’” Serbian E. Orthodox Diocese for the United States of Am. & Canada v.
Milivojevich, 426 U.S. 696, 709, 96 S. Ct. 2372, 2380 (1976) (quoting Presbyterian
Church v. Hull Church, 393 U.S. 440, 449, 89 S. Ct. 601, 606 (1969)). 
 
“First Amendment values are plainly jeopardized when church property
litigation is made to turn on the resolution by civil courts of controversies
over religious doctrine and practice. If civil courts undertake to resolve
such controversies in order to adjudicate the property dispute, the hazards
are ever present of inhibiting the free development of religious doctrine
and of implicating secular interests in matters of purely ecclesiastical
concern. . . . [T]he [First] Amendment therefore commands civil courts
to decide church property disputes without resolving underlying
controversies over religious doctrine.” This principle applies with equal
force to church disputes over church polity and church administration.

Milivojevich, 426 U.S. at 709–10, 96 S. Ct. at 2380–81 (quoting Presbyterian Church,
393 U.S. at 449, 89 S. Ct. at 606) (emphasis added). 
          As a corollary to the First Amendment’s prohibition discussed above, when a
court cannot resolve a civil dispute without extensive inquiry into religious law or
polity, the court may not disturb “the decisions of the highest ecclesiastical tribunal
within a church of hierarchical polity,” but instead “must accept such decisions as
binding on them, in their application to the religious issues of doctrine or polity before
them.” Id. at 709, 96 S. Ct. at 2380; accord Jones v. Wolf, 443 U.S. 595, 602, 99 S.
Ct. 3020, 3025 (1979). Courts must defer in this way when “‘questions of discipline,
or of faith, or ecclesiastical rule, custom, or law’” have been decided by the highest
church judicatory. Milivojevich, 426 U.S. at 710, 96 S. Ct. at 2381 (quoting Watson
v. Jones, 13 Wall. 679, 80 U.S. 679 (1871)). This doctrine is sometimes referred to
as one of “ecclesiastical abstention,” “ecclesiastical exemption,” or “deference.” See 
Lacy v. Bassett, 132 S.W.3d 119, 123 (Tex. App—Houston [14th Dist.] 2004, no pet.)
(“ecclesiastical abstention”); Tran, 934 S.W.2d at 743, 744 (“ecclesiastical
exemption”); Schismatic & Purported Casa Linda Presbyterian Church in Am. v.
Grace Union Presbytery, Inc., 710 S.W.2d 700, 703 (Tex. App.—Dallas 1986, writ
ref’d n.r.e.) (“deference rule”). Under this doctrine, although wrongs “may exist and
be severe, and although the administration of the church may be inadequate to provide
a remedy, the preservation of the free exercise of religion is deemed so important a
principle it overshadows the inequities which may result from its liberal application.” 
Tran, 934 S.W.2d at 743.
          Nevertheless, because “churches, their congregations, and hierarchy exist and
function within the civil community,” they, like other voluntary societies, can be
amenable to suits based on “rules governing civil, contract, or property rights,” as long
as the First Amendment is not thereby violated. Lacy, 132 S.W.3d at 124. 
Accordingly, civil courts may resolve church disputes that do not concern issues of
religious discipline, faith, or ecclesiastical rule, custom, or law. In doing so, courts
may adopt any method of resolving those disputes that does not involve consideration
of the prohibited matters. See Jones, 443 U.S. at 602, 99 S. Ct. at 3025. One such
method that the United States Supreme Court has approved is the “neutral-principles-of-law” approach, in which courts may resolve matters involving civil, property, or
contract rights in church disputes as long as neutral principles of law alone may be
applied to decide the issues. See id. at 604, 99 S. Ct. at 3026; see also Lacy, 132
S.W.3d at 123; Schismatic & Purported Casa Linda Presbyterian Church in Am., 710
S.W.2d at 704. Under such an approach, a court may, for example, interpret church
documents in purely secular terms without relying on religious precepts to resolve the
underlying conflict. Jones, 443 U.S. at 604, 99 S. Ct. at 3026; Lacy, 132 S.W.3d at
123. However, if an issue—even one that is claimed to be based solely on neutral
principles of law—cannot be decided without determining prohibited religious
matters, the court must defer to the ecclesiastical authority’s resolution of that issue. 
See Jones, 443 U.S. at 604, 99 S. Ct. at 3026; Lacy, 132 S.W.3d at 123. A court
determines whether a dispute is one that the First Amendment prohibits a court from
determining by first examining the substance and effect of the plaintiff’s petition,
without considering the technical claims asserted, to determine the suit’s ecclesiastical
implications. Williams v. Gleason, 26 S.W.3d 54, 59 (Tex. App.—Houston [14th
Dist.] 2000, pet. denied); Tran, 934 S.W.2d at 743. 
          The United States Supreme Court has classified churches into three categories
for purposes of civil property disputes, two of which categories are congregational
churches and hierarchical churches. See Watson, 80 U.S. at 722. Congregational
churches are those that are “strictly independent of other ecclesiastical associations,
and so far as church government is concerned, owe[] no fealty or obligation to any
higher authority.” Id. Hierarchical churches are “those organized as a body with other
churches having similar faith and doctrine with a common ruling convocation or
ecclesiastical head.” Kedroff, 344 U.S. at 110, 73 S. Ct. at 151 (citing Watson, 80 U.S.
at 722). 
          The ecclesiastical-abstention doctrine, and the neutral-principles-of-law
corollary to resolving church disputes, apply equally to congregational and
hierarchical religious organizations. See Patterson v. Sw. Baptist Theological
Seminary, 858 S.W.2d 602, 606 (Tex. App.—Fort Worth 1993, no writ) (so holding
with respect to ecclesiastical-abstention doctrine). This result obtains because the
First Amendment’s rights and prohibitions apply equally in either context. However,
the religious entity to which courts must defer on matters into which the First
Amendment prohibits judicial inquiry differs for each type of religious organization. 
In congregational churches, the highest authority is either the majority of the
membership or whatever government the congregation has established locally; in
hierarchical churches, in contrast, the highest authority on ecclesiastical matters is “the
highest of the[] church judicatories to which the matter has been carried . . . .” See
Watson, 80 U.S. at 724–25, 726–27.
C.      The Hierarchical Structure of the Greek Orthodox Church
          Appellants concede that “this dispute involves a hierarchical religious body,”
and the information of which appellees requested the trial court to take judicial notice
supports this position. “The Orthodox Church today is a communion of self governing
Churches, each administratively independent of the other, but united by a common
faith and spirituality.” Rev. Robert G. Stephanopoulos, The Greek (Eastern) Orthodox
Church in America, http://www.goarch.org/en/archdiocese/ (last visited May 26,
2006). The Greek Orthodox Church is part of this orthodox communion. See id. 
          The Archdiocese is part of the Greek Orthodox Church. See id. The
Archdiocese “is governed by the Archbishop and the Eparchial Synod of Bishops. 
The Synod of Bishops is headed by the Archbishop and comprised of the Bishops who
oversee the ministry of the Metropolises. It has all the authority and responsibility
which the Church canons provide for a provincial synod.” 
http://www.goarch.org/en/archdiocese/about/ (last visited May 26, 2006). The
Archdiocese is composed of an Archdiocesan District and eight Metropolises. See id. 
The hierarch of each Metropolis is the Metropolitan Bishop, also known as the
Metropolitan. 
          One such Metropolis is the Metropolis of Denver, which has jurisdiction over
2 chapels and 49 parishes, including the Cathedral. See
http://www.denver.goarch.org/ (last visited May 26, 2006). In 1992, Metropolitan
Isaiah was enthroned as Bishop of what would become the Metropolis of Denver.


 See
http://www.denver.goarch.org/bio.html (last visited May 26, 2006).
 
          The Cathedral’s local by-laws


 provided that one of the Cathedral’s corporate
purposes was “[t]o maintain, conduct and operate a church in conformity with the
doctrine, canons, worship, discipline, usages and customs of the Greek Orthodox
Church.” The local by-laws also required that candidates for parish council be
members of the Cathedral in good standing for at least a year before the election. To
be in good standing, a member was required, among other things, to live “according
to the faith and canons of the [Greek Orthodox] Church . . . .” The local by-laws also
required newly elected parish council members to have their election ratified by the
Metropolitan and, after that ratification, to be administered the oath of office by the
parish priest. No newly elected council member could assume his duties until the
priest had sworn him in. The local by-laws further required the parish council to
conduct the Cathedral’s secular business “in furtherance of the aims and purposes of
the [Greek Orthodox] Church and in accordance with . . . the constitution, canons,
discipline, and regulations of the Archdiocese.” The local by-laws also provided that
the parish council “refer all spiritual questions or matters pertaining to the clergy” to
the Metropolitan. Under the same local by-laws, parish council members had to be
relieved of their duties if, among other things, they had ceased to be “attached or
devoted to the doctrines, constitutions, canons, administrative rulings, discipline, . . .
practices, regulations and encyclicals of the Archdiocese” or if they did not “recognize
the duly constituted Ecclesiastical authorities” or sought to defame those authorities. 
The local by-laws did not, however, expressly provide for a means for parish council
members’ removal for the reasons stated above.
D.      The Application of the Law to the Facts
          In their sole issue on appeal, appellants argue: “Did appellants’ pleading allege
a declaratory judgment action seeking interpretation and enforcement of provisions
of the Texas Non-Profit Corporation Act and a Texas non-profit corporation’s by-laws?” Appellants argue, in effect, that this controversy involves a simple
determination of which by-laws apply and the application of the TNPCA’s provisions
to the corporate organization. They assert that, in this case, “[c]ompeting church
members are arguing about who are the proper directors” and that “[t]his dispute does
not involve the question of who are the church’s ministers, elders, deacons, et cetera. 
This dispute does involve the election of directors, removal of directors, scheduling
of meetings, scheduling of elections, and access to membership list [sic].” In sum,
appellants argue that the issues in this case may be decided under purely neutral
principles of law, without involving consideration of issues of religious discipline,
faith, or ecclesiastical rule, custom, or law.
          We disagree. The controversy inherently and inextricably involves a presiding
hierarch’s power to discipline a local parish council; his power to determine whether
that council’s members have violated their oath to obey the church’s hierarchy,
discipline, and canons; and an archdiocese’s right to insist on what by-laws may be
adopted by its subordinate parishes. See Tran, 934 S.W.2d at 743 (requiring court to
look to complaint’s substance and effect, rather than to causes of action pleaded, in
determining whether complaint implicates ecclesiastical matters). Those are
ecclesiastical matters that the First Amendment forbids courts to adjudicate. See
Green v. United Pentecostal Church Int’l, 899 S.W.2d 28, 30 (Tex. App.—Austin
1995, writ denied) (rejecting claim that, in terminating minister’s license, church
violated its own rules because plaintiff “was dismissed as an act of discipline, and
questions of church discipline and government are left to the church, limited only by
the courts’ supervision of property and civil rights”); Mangum v. Searingen, 565
S.W.2d 957, 959 (Tex. Civ. App.—San Antonio 1978, writ ref’d n.r.e.) (concluding
that ouster of deacons was ecclesiastic matter, despite plaintiffs’ allegation that their
removal was in violation of corporate by-laws); cf. Milivojevich, 426 U.S. at 717, 96
S. Ct. at 2384 (“Nor is there any dispute that questions of church discipline and the
composition of church hierarchy are at the core of ecclesiastical concern . . . .”); Tran,
934 S.W.2d at 744 (holding that statements made by bishop concerning priest’s ex-communication were part of ecclesiastical transaction, which was determination of
priestly authority). These issues are inextricably intertwined with appellants’ requests
for a declaration that the local by-laws controlled and that they were improperly
removed and thus represented the Cathedral even after their removal. This
intertwining prevents our resolving this dispute on purely neutral principles of law. 
See Jones, 443 U.S. at 604, 99 S. Ct. at 3026 (indicating that, if issue cannot be
decided without resolving religious controversy, court must defer to ecclesiastical
authority’s resolution of doctrinal issue); Lacy, 132 S.W.3d at 123 (same).
          Appellants counter that they are simply relying on the TNPCA’s provisions that
require non-profit corporations to be controlled by a board of trustees; that provide
that the number of trustees and the lengths of their service are controlled by the
corporation’s by-laws; and that provide that trustees’ election and removal be
conducted pursuant to the corporation’s charter or by-laws, which appellants argue
were the local by-laws. See Tex. Rev. Civ. Stat. Ann. arts. 1396–2.14, § A,
1396–2.15, 1396–2.21, § A (Vernon 2003). They thus conclude that appellees are
“cavalierly disregard[ing] the [TNPCA]” by asserting that the issues in this case
concern ecclesiastical matters. However, this dispute primarily concerns which by-laws controlled in the first place—the UPRs or the local by-laws. Everyone agrees
that the Cathedral’s members did not adopt the UPRs, and appellants’ petition alleged
that the Cathedral had expressly rejected them. The parties disagree, however, on
whether the Cathedral could have adopted anything but the UPRs, when the Cathedral
was subordinate to an Archdiocese and a Metropolitan who had requested that they be
adopted, and whether the Cathedral had actually adopted the UPRs by having
accepted Father Karambis as its proistamenos because the Cathedral was subordinate
to the church hierarchy that had approved the UPRs and because the UPRs themselves
provided that the mere assignment of a parish priest would bind the parish to the
regulations. Those matters are at the heart of this dispute, and they are inextricably
intertwined with ecclesiastical issues of church governance, polity, and doctrine that
we may not determine.
          Here, we have an undisputably hierarchical church. It was Metropolitan Isaiah
who refused to ratify the elections of five of the appellants, who relieved the other
appellants of their parish council offices and refused to reinstate them, and who
selected an interim council until new elections could be held. And Metropolitan Isaiah
was the hierarch with authority over the Metropolis of Denver, under the jurisdiction
of which the Cathedral (and its parish council) fell.
 
          Even the local by-laws, on which appellants based all of their claims, indicated
that the Metropolitan of Denver was the church authority over the matters underlying
at least some of their claims for declaratory relief. For example, the local by-laws
provided that those who felt that they had unjustifiably been removed from office
appeal to the Metropolitan. Additionally, the same by-laws required that all “matters
pertaining to the clergy” be submitted to the Metropolitan—to whom appellants did,
in fact, appeal with respect to Father Karambis. Finally, the local by-laws provided
that the Metropolitan had to ratify parish council members’ election, that the parish
priest was to administer the oath of office after receipt of the Metropolitan’s
ratification, and that no parish council member elect could assume his duties until he
had been duly sworn. Therefore, “the highest of the[] church judicatories” that even
appellants’ version of the by-laws recognized over matters concerning the proper
removal of parish council members, their ratification, and matters relating to the clergy
was Metropolitan Isaiah. The Metropolitan determined that appellants not be
reinstated to the parish council—that is, he determined that they were no longer duly
elected members of the board. The parties’ dispute also arose from the assignment of
Father Karambis and from his and the parish council’s inability to work together
harmoniously—matters that the local by-laws required be submitted to the
Metropolitan. Finally, for the appellants who were elected in December 2002,
Metropolitan Isaiah controlled whether they were ratified and thus could be sworn or
could assume their duties on the parish council—and he declined to ratify their
elections.
          We distinguish the authority on which appellants rely. In Lacy v. Bassett, the
trial court was able to apply neutral principles of law because the plaintiff sought only
access to church financial records. See id., 132 S.W.3d at 124–25. Here, in contrast,
as discussed above, appellants did not seek declaratory or injunctive relief for access
to church records. Appellants also rely on Chen v. Tseng,


 which, as a memorandum
opinion, is not binding precedent of this Court. See Tex. R. App. P. 47.7; Spates v.
Wal-Mart Stores, Inc., 144 S.W.3d 657, 661 n.2 (Tex. App.—Corpus Christi 2004),
rev’d on other grounds, 186 S.W.3d 566 (Tex. 2006). In any event, Chen is
distinguishable. The Chen court was able to determine which board members were
the lawful ones because there was no preserved challenge concerning which by-laws
applied and what they required;


 rather, the dispute concerned whether various
elections and appointments were lawful under those by-laws. Id., No. 01-02-01005-CV, 2004 WL 35989, at *3, *6 (Tex. App.—Houston [1st Dist.] Jan. 8, 2004, no pet.). 
Additionally, the plaintiffs in Chen sought corporate records and documents. Id. at *3. 
Here, in contrast, appellants did not request injunctive or declaratory relief to access
church records. Additionally, the pleadings and materials that the Chen court
considered indicated that a higher church authority was disputing whether the local
by-laws, on which appellants based their whole case, controlled to the exclusion of the
UPRs. Determining which version of the by-laws in fact controlled thus involved
determining the ecclesiastical powers of the higher church authorities that claimed that
their version controlled. In Chen, in contrast, the appellants’ challenges indicated that
the trial court had found that the religious organization was congregational. Id. at *6. 
In congregational religious organizations, the highest ecclesiastical authority is
generally either the majority of the membership or whatever government the
congregation has established locally. See Watson, 80 U.S. at 724–25, 726–27. Chen
thus did not involve the situation in which a higher authority, external of the local
congregation, was disputing what the document governing the local congregation was. 
Moreover, the evidence before the trial court in Chen showed that membership in the
religious corporation was not co-extensive with membership in the religion. See Chen,
2004 WL 35989, at *6.
 
E.      The Resolution
          For these reasons, we hold that the trial court did not err in determining that the
First Amendment precluded adjudication of all of appellants’ requests for declaratory
relief and in implicitly concluding that neutral principles of law could not be applied
to those requests. See, e.g., Milivojevich, 426 U.S. at 710, 96 S. Ct. at 1381.
Accordingly, we further hold that the trial court did not err in dismissing appellants’
claims for want of subject-matter jurisdiction.



 

Conclusion
          We affirm the judgment of the trial court.
 
 
 
                                                             Tim Taft
                                                             Justice

Panel consists of Chief Justice Radack and Justices Taft and Nuchia.