# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-10-00015-CV

---

**Robert Masterson, Mark Brown, George Butler, Charles Westbrook, Richey Oliver, Craig Porter, Sharon Weber, June Smith, Rita Baker, Stephanie Peddy, Billy Ruth Hodges, Dallas Christian and The Episcopal Church of the Good Shepherd, Appellants**

**v.**

**The Diocese of Northwest Texas, The Rev. Celia Ellery, Don Griffis and Michael Ryan, Appellees**

---

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT NO. A-07-0237-C, HONORABLE J. BLAIR CHERRY, JUDGE PRESIDING**

---

## O P I N I O N

This appeal arises from a property dispute among parishioners from the Episcopal Church of the Good Shepherd ("Good Shepherd") in San Angelo, Texas. In 2006, a majority of the Good Shepherd parishioners voted to withdraw Good Shepherd from the Episcopal Church of the United States and the Diocese of Northwest Texas and to reorganize as the Anglican Church of the Good Shepherd affiliated with the Diocese of Uganda, Africa; a minority voted to continue Good Shepherd's affiliation with the Episcopal Church and the Diocese of Northwest Texas (the "Diocese"). The Diocese and the individual appellees, The Rev. Celia Ellery, Don Griffis, and Michael Ryan (collectively, the "Continuing Parish Leaders"), filed suit for declaratory judgment to establish their rights to continued possession and control over the church property, which was claimed by appellants, who are members of the withdrawing group (collectively, the "Former Parish

Leaders").[1]  The Former Parish Leaders counterclaimed with a suit to quiet title and request for declaratory judgment that they were entitled to possession and use of the church property.  The Diocese and Continuing Parish Leaders moved for summary judgment, which the trial court granted.  The Former Parish Leaders appeal, arguing primarily that the trial court erred in failing to properly apply "neutral principles" of law to resolve the dispute.  We will affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The Diocese is one of 111 regional dioceses of the Episcopal Church, responsible for carrying out the Episcopal Church's ministry and mission within a geographical area that includes Good Shepherd.  In 1961, three members of the Episcopal Church purchased a tract of land in San Angelo on which Good Shepherd was later built.  The following year, they donated the property to the Trustees of the Diocese for the purpose of establishing a mission church.  In September 1965, Good Shepherd submitted an "Application for Organization of Mission," in which it promised to "establish and sustain the regular worship of the [Episcopal] Church, to promote its purpose and influence" and to "conform[] to the Constitution and Canons of the General Convention and the Diocese of Northwest Texas."  Thereafter, Good Shepherd participated in the annual Conventions for the Episcopal Diocese of Northwest Texas each year from its formation until the present dispute arose.

---

[1]  The individual appellants include Robert Masterson, Mark Brown, George Butler, Charles Westbrook, Richey Oliver, Craig Porter, Sharon Weber, June Smith, Rita Baker, Stephanie Peddy, Billy Ruth Hodges, and Dallas Christian.  Good Shepherd was named as a nominal defendant, as it was under the control of the Former Parish Leaders at the time the suit was filed. It is now a nominal appellant.

In 1974, after the Good Shepherd mission was incorporated, it achieved parish status and was accepted into union with the Diocese.[2] The same year, the first vestry of Good Shepherd filed articles of incorporation as the "Episcopal Church of the Good Shepherd," pledging to hold office in accordance with the Episcopal Church Canons. Thereafter, Good Shepherd enacted Bylaws, which provide that Good Shepherd is

> a constituent part of the Diocese of Northwest Texas and of the Protestant Episcopal Church in the United States of America. The parish accedes to, recognizes, and adopts the General Constitution and Canons of that Church, and the Constitution and Canons of the Diocese of Northwest Texas and acknowledges the authority of the same.[3]

The Bylaws further state that

> [t]he Rector, Wardens and Vestry of the Church of the Good Shepherd are hereby constituted Trustees Corporate and Politic. If the Parish be without a Rector, all rights respecting title to properties of the Parish shall be vested in the Wardens and Vestry with the condition that any change thereof be made with the knowledge and written consent of the then ecclesiastical authority of the Diocese.

---

[2] Under the Diocesan Canons, title to any property acquired by or for a mission congregation shall be held by the Diocese "until such time as the Mission becomes a Parish." On achieving parish status, a congregation must incorporate under the laws of Texas in order to facilitate and conduct its affairs; "such incorporated parish shall hold title of and administer the real property and trust funds of the Parish." If a parish is dissolved by the Diocese, "such property as it may own shall be delivered and conveyed to the [Diocese]."

[3] A number of the Canons of the Episcopal Church and the Diocese contain provisions relating to possession and use of church property, chiefly Canon I.7.4, which recites an express trust in favor of the denominational church: "All real and personal property held by or for the benefit of any congregation is held in trust for this Church and the Diocese thereof in which such congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the congregation otherwise existing over such property so long as the particular congregation remains a part of, and subject to, this Church and its Constitution and Canons."

3

In 1982, the Board of Trustees for the Diocese conveyed the property and improvements thereon to Good Shepherd by general warranty deed for ten dollars. Title to the land was taken in the name of the "Good Shepherd Episcopal Church." The land conveyed by the 1982 deed, along with an additional tract acquired in 2005 and the personal property of Good Shepherd, constitute the church property subject to the instant dispute.

In November 2006, the vestry of Good Shepherd recommended certain resolutions that sought to withdraw Good Shepherd from the Episcopal Church and the Diocese and to begin worship as a new, distinct, and independent church. The resolutions purported to change the name of Good Shepherd to the "Anglican Church of the Good Shepherd," to dissolve its union with the Episcopal Church and with the Diocese, and to revoke any trusts previously imposed on any property of Good Shepherd in favor of the Episcopal Church, the Diocese, or the Northwest Episcopal Board of Trustees. A majority of Good Shepherd's members voted to adopt the resolutions by a margin of 53 to 30. In response, Wallace Ohl, Bishop of the Episcopal Church in the Diocese of Northwest Texas, reached out to the parishioners who wished to remain with the Episcopal Church. Bishop Ohl requested that those parishioners who wished to leave the Episcopal Church depart the premises by January 5, 2007, and informed the Former Parish Leaders that Good Shepherd's real and personal property was held in trust for the Diocese for the benefit of the Episcopal Church and those members of Good Shepherd who remained faithful. Since then, the continuing parishioners of Good Shepherd have elected a new vestry, which has been recognized by Bishop Ohl and the Diocese as the true and proper representative of Good Shepherd. The Reverend Celia Ellery was appointed priest-in-charge, effective January 6, 2007.

When the Former Parish Leaders and the parishioners aligned with them refused to vacate the premises in accordance with Bishop Ohl's order, the Diocese and Continuing Parish Leaders filed this suit for declaratory judgment. The Former Parish Leaders filed an answer and counterclaims, seeking to quiet title and have the trial court declare that they, the Anglican Church of the Good Shepherd, were entitled to retain control over the property. The Diocese and Continuing Parish Leaders moved for summary judgment on the grounds that the church property is, as a matter of law, held in trust for the Episcopal Church and the Diocese for those members of Good Shepherd who remain loyal and that, pursuant to Texas law and Episcopal Church Canons, the dissenting members could not unilaterally dissolve the relationship between Good Shepherd and the Diocese and still retain control and use of the property.

The trial court granted the Diocese and Continuing Parish Leaders' motion for summary judgment, declaring that the Former Parish Leaders may not divert, alienate, or use the real or personal property of Good Shepherd, except in furtherance of the mission of the Episcopal Church as provided by and in accordance with the Constitutions and Canons of the Episcopal Church and the Diocese. The court further declared that:

> the continuing Parish of the Good Shepherd is identified as and represented by those persons recognized by the Bishop of the Episcopal Diocese of Northwest Texas;
>
> the actions of the Defendants in seeking to withdraw Good Shepherd as a Parish of the Diocese and from the Episcopal Church are void and without effect; and
>
> all real and personal property of the Good Shepherd is held in trust for the Episcopal Church and the Diocese.

The Former Parish Leaders perfected this appeal.

5

**STANDARD OF REVIEW**

We review a trial court's grant of summary judgment de novo. *Mid-Century Ins. Co. v. Ademaj*, 243 S.W.3d 618, 622 (Tex. 2007). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). The party moving for a traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.* at 216.

**DISCUSSION**

In their first issue, the Former Parish Leaders argue that the trial court erred by failing to resolve the property dispute through the application of "neutral principles of law." In their second issue, they assert that the trial court erred in rendering summary judgment "that deferred the dispute to a ruling by the Bishop." Specifically, the Former Parish Leaders contend that this dispute can be resolved simply by interpreting the 1982 general warranty deed in conjunction with constitutional and common law principles. These neutral principles of law, they argue, conclusively establish that control of Good Shepherd vests in its members, that the majority's vote to withdraw was effective and did not require the consent of the Episcopal Church, and that any claim to the property of Good Shepherd by the Diocese on behalf of the Episcopal Church contradicts the terms of the general warranty deed held by Good Shepherd. In order to adequately address these complaints, we will first briefly outline the law governing these types of church-property disputes.

6

*The First Amendment*

The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I. Government action can burden the free exercise of religion in one of two ways: by interfering with an individual's observance or practice of a particular faith, *see, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993), or by encroaching on the church's ability to manage its internal affairs, *see, e.g.*, *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952).[4] Following this constitutional mandate, civil courts may not intrude into inherently "religious" or "ecclesiastical" matters. *See Westbrook v. Penley*, 231 S.W.3d 389, 398-99 (Tex. 2006). In Texas, this doctrine has been referred to as one of "ecclesiastical abstention" or "ecclesiastical exemption." *See Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see also Patton v. Jones*, 212 S.W.3d 541,

---

[4] The dangers posed by civil courts probing too deeply into church affairs have been well articulated by the Supreme Court:

> First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.

*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709-10 (1976); *see also Watson v. Jones*, 80 U.S. 679, 728-29 (1872).

555 n.13 (Tex. App.—Austin 2007, pet. denied); *Schismatic & Purported Casa Linda Presbyterian Church v. Grace Union Presbytery, Inc.*, 710 S.W.2d 700, 703 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). The ecclesiastical-abstention doctrine stands for the proposition that the First Amendment prohibits civil courts from exercising jurisdiction over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713-14 (1976).

> [T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization.

*Jones v. Wolf*, 443 U.S. 595, 602 (1979) (citations omitted).

### The Neutral-Principles Approach

The neutral-principles approach on which the Former Parish Leaders rely can be seen as an exception to the ecclesiastical-abstention doctrine. *See Westbrook*, 231 S.W.3d at 398; *see also Wolf*, 443 U.S. at 602-05 (states may adopt neutral principles of law without running afoul of First Amendment so long as resolution of ownership entails no inquiry into religious doctrine). In the context of property-rights litigation, the neutral-principles approach confers jurisdiction on civil courts to apply neutral principles of law "developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded" in violation of the First Amendment. *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,

8

393 U.S. 440, 449 (1969).  In practice, this means that a court employing a neutral-principles approach may itself interpret the governing documents of the church, deeds of conveyance, canons, rules, and relevant statutes, so long as it does so without relying on religious precepts to resolve the underlying dispute.  *See Wolf*, 443 U.S. at 604.

The neutral-principles approach was approved by the United States Supreme Court in *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367 (1970), an appeal from a state court judgment settling a local church property dispute on the basis of the language of the deeds, the terms of the local church charters, the constitution of the general church, and state statutes. Reflecting on the advantages inherent in the neutral-principles approach, the Supreme Court in *Jones v. Wolf* noted that it "is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity," as it relies exclusively on "objective, well-established concepts of trust and property law familiar to lawyers and judges."  443 U.S. at 603.

> Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties.  Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy.  In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

*Id.* at 603-04.

But even the neutral-principles approach is not "wholly free of difficulty," as "there may be cases where the deed, the corporate charter, or the constitution of the general church

incorporates religious concepts in the provisions relating to the ownership of property." *Id.* at 604.

"If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* (citing *Milivojevich*, 426 U.S. at 709). Therefore, even when a court is properly applying the neutral-principles approach, it will have to defer to decision makers within the church to the extent that resolution of the property dispute overlaps with ecclesiastical matters. *See id.*; *Westbrook*, 231 S.W.3d at 399 ("[I]f interpretation of the instruments of ownership would require the court's resolution of a religious controversy, the court must defer to ecclesiastical resolution of the doctrinal issue.").

An alternative to neutral principles is the approach the Supreme Court first articulated in *Watson v. Jones*, 80 U.S. 679 (1872). Under *Watson*, civil courts simply enforce the property decisions made by the relevant governing body within the church without inquiring whether that body has power under religious law to control the property in question. 80 U.S. at 722-24; *see Maryland & Va. Eldership of the Churches of God*, 396 U.S. at 368-69 (Brennan, J., concurring). The gist of this approach is that people who unite themselves to a church organization are seen to do so with an implied consent that intrachurch conflicts, including property disputes, will be decided by the church. *See Watson*, 80 U.S. at 722. Under the *Watson* "principle of government" or "compulsory deference" approach,

> civil courts review ecclesiastical doctrine and polity to determine where the church has placed ultimate authority over the use of the church property. After answering this question, the courts would be required to determine whether the dispute has been resolved within that structure of government and, if so, what decision has been made. They would then be required to enforce that decision.

10

*Wolf*, 443 U.S. at 605 (internal quotation marks and citations omitted).  Such a rule of compulsory deference does not necessarily involve less entanglement of civil courts in matters of religious doctrine, however, because "civil courts would always be required to examine the polity and administration of a church to determine which unit of government has ultimate control over church property."  *Id.* at 605.  In some cases, "the locus of control would be ambiguous," requiring "a careful examination of the constitutions of the general and local church" and resulting in "a searching and therefore impermissible inquiry into church polity."  *Id.*  Nevertheless, as *Jones v. Wolf* makes clear, it remains the rule that under any approach, civil courts must accept as binding a church adjudication regarding "questions of discipline, or of faith, or ecclesiastical rule, custom, or law."  *Id.* at 595 (citing *Watson*, 80 U.S. at 727).

### *Neutral Principles v. Compulsory Deference:  A Question of State Law*

Much of the Former Parish Leaders' briefing is devoted to their position that the trial court was required to apply the neutral-principles approach, rather than the *Watson* rule of compulsory deference, and that it failed to do so.  The United States Supreme Court, however, has expressly approved both of these methods for deciding questions of title to church property, leaving it to the states to decide which approach to adopt.  *See id.* at 602 ("[T]he First Amendment does not dictate that a State must follow a particular method of resolving church disputes.  Indeed, a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no

11

consideration of doctrinal matters . . . ." (internal quotation marks omitted)).  In other words, "how state courts resolve church property disputes is a matter of state law," so long as the method a state chooses does not violate the First Amendment.  *Episcopal Church Cases*, 198 P.3d 66, 74 (Cal. 2009).

The Texas Supreme Court has not expressly approved a particular method to adjudicate church-property disputes, although it has "long recognized a structural restraint on the constitutional power of civil courts to regulate matters of religion in general."  *Westbrook*, 231 S.W.3d at 397-98 (citing *Brown v. Clark*, 116 S.W. 360, 363 (Tex. 1909)).  In *Brown*, the only church-property dispute it has yet decided, the court was careful to sidestep any issues that fell within the exclusive jurisdiction of the ecclesiastical judicatories, including the case-determinative question of whether the local church possessed the authority to determine that it could enter into union with the denominational Presbyterian Church.  *See* 116 S.W. at 364.  Having deferred to the affirmative answer of the local church's General Assembly on that issue, the court then turned to what was "perhaps the only question in the case of which this court has jurisdiction":  how the resulting union between the two churches affected possession and control of the church property.  *Id.*  The court answered that question by construing the general warranty deed for the property, which was made to the trustees of the local church, while considering the fact that the local church "was but a member of and under the control of the larger and more important Christian organization."  *Id.*  In light of that union, the court held that the local church had been incorporated into the Presbyterian Church and therefore "those members who recognize the authority of the Presbyterian Church in the United States of America are entitled to possession and use of the property."  *Id.*

12

As the Former Parish Leaders correctly point out, the analysis that the court conducted in *Brown* is consistent with the neutral-principles approach. That does not mean, however, that a Texas court is required to follow the same approach. Because the trial court was not required to adopt any particular approach in resolving the instant dispute, *see Wolf*, 443 U.S. at 602, we overrule the Former Parish Leaders' first issue asserting that the trial court erred by failing to apply neutral principles of law.[5]

In their second issue, the Former Parish Leaders complain that the trial court "erred in granting summary judgment that deferred the dispute to a ruling by the Bishop." They argue that this is error because the Episcopal Church lacks the necessary tribunals and rules to (1) adjudicate the property dispute, (2) remove the vestry of Good Shepherd, or (3) exclude people from membership in Good Shepherd. The deference that the trial court allegedly afforded the Diocese would only be appropriate, they assert, if the record conclusively established that the Episcopal Church is a "hierarchical" organization that had established the necessary institutions to govern disputes over the government and direction of subordinate bodies. *See Milivojevich*, 426 U.S. at 724. According to the Former Parish Leaders, the record actually supports the conclusion that Good Shepherd is an independent organization free from control by the Episcopal Church hierarchy, and that the only decisions entitled to any deference are those made by

---

[5] In support of their first issue, the Former Parish Leaders make a number of assertions that they label as sub-issues, including "Texas District Courts have subject matter jurisdiction to apply 'neutral principles' of law" and "application of 'neutral-principles' [sic] to determine property disputes is not restricted to congregational churches." Because these statements concern matters that are not in dispute, we need not address them.

13

a majority of its membership to disaffiliate from the Diocese and the Episcopal Church. Before addressing the merits of these arguments, we will first examine the context from which they arise.

### *Hierarchical and Congregational Churches*

In discussing the proper role for civil courts to play in adjudicating these cases, the United States Supreme Court has analyzed two different scenarios that predominate in church-property disputes. The first involves property held by a "religious congregation which is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government." *See Watson*, 80 U.S. at 726. Such bodies are referred to as "hierarchical" churches. *Kedroff*, 344 U.S. at 110 (defining "hierarchical churches" as "those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head"). In those cases, "we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." *Watson*, 80 U.S. at 726-27. "The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." *Id.* at 722. These are classified as "congregational churches," and, being independent and self-governing, are analyzed in accordance with "the ordinary principles which govern voluntary associations." *See id.* at 724-25.

Under the rule announced in *Watson*, the distinction between the two church classifications is important when courts must identify the entity to which it shall defer on matters

14

protected from judicial scrutiny. When a dispute arises in a hierarchical church, the authority entitled to deference on ecclesiastical matters is "the highest of the[] church judicatories to which the matter has been carried." *See id.* at 727. If, however, a dispute arises in a congregational church, the "principle of government" adopted by the church dictates who can determine the right of control—e.g., "[i]f the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property." *Id.* at 725. Or, if a congregational church vests power in a governing board or vestry, "then those who adhere to the acknowledged organism by which the body is governed are entitled to use of the property." *Id.*

A court applying the *Watson* rule of "compulsory deference" need only consider which type of organizational model a church conforms to; once that decision is made, the court defers to, and thereby enforces, the decision of the proper ecclesiastical authority. By arguing that the trial court was required to give effect to the majority's vote to withdraw Good Shepherd from the Episcopal Church and the Diocese and to reorganize as the Good Shepherd Anglican Church, the Former Parish Leaders are implicitly invoking the deference rule in combination with the assertion that Good Shepherd is a congregational church under the sole control of a majority of its members. Thus, by complaining that the trial court erred in paying deference to the Diocese and Bishop Ohl's determination that the faction aligned with the Former Parish Leaders does not, in fact, represent Good Shepherd, they are really arguing that the court misapplied the deference rule by characterizing Good Shepherd as a hierarchical church rather than a congregational one. In response, the Diocese and Continuing Parish Leaders argue that the trial court correctly determined that

15

the Episcopal Church is hierarchical and that the parishes within the hierarchy, including Good Shepherd, are subject to governance by the ecclesiastical head of the general church.

Several factors are to be weighed in determining whether a church is hierarchical, including (1) the affiliation of the local church with a parent church, (2) an ascending order of ecclesiastical judicatories in which the government of the local church is subject to review and control by higher authorities, (3) subjugation of the local church to the jurisdiction of a parent church or to a constitution and canons promulgated by the parent church, (4) a charter from the parent church governing the affairs of the local church and specifying ownership of local church property, (5) the repository of legal title, and (6) the licensing or ordination of local ministers by the parent church. *Templo Ebenezer, Inc. v. Evangelical Assemblies, Inc.*, 752 S.W.2d 197, 198-99 (Tex. App.—Amarillo 1988, no writ); *see Schismatic & Purported Casa Linda Presbyterian Church*, 710 S.W.2d at 702; *Browning v. Burton*, 273 S.W.2d 131, 133-34 (Tex. Civ. App.—Austin 1954, writ ref'd n.r.e.).

In the present case, the summary-judgment record establishes conclusively that the Episcopal Church is hierarchical and that Good Shepherd is, in accordance with its bylaws and other governing documents, a constituent part of the Episcopal Church and the Diocese.[6] Accordingly,

---

[6] Briefly, the summary-judgment record details that the Episcopal Church is made up of nearly 7,700 congregations, primarily parishes, that are organized into 111 regional dioceses. It is governed by a General Convention and a presiding bishop, while each diocese is governed by a diocesan convention and a bishop. The Constitutions and Canons of the Episcopal Church and each diocese are binding on all congregations within the diocese. The Constitution of the Diocese requires all congregations to accede in writing to the rules of the Episcopal Church as a condition of acceptance as a parish of the Diocese. The bylaws and articles of incorporation of Good Shepherd affirm these commitments, establishing that Good Shepherd agreed from its inception to be part of the greater denominational church and to be bound by that church's governing instruments. The

the *Watson* rule would require that the trial court and this Court defer to ecclesiastical decisions made within the Episcopal Church hierarchy that bear on the property-ownership dispute, rather than be bound by the views of the defecting parishioners, notwithstanding that they constituted a majority of the members of the parish. *See Milivojevich*, 426 U.S. at 709. Because the trial court did not err in deferring to decisions of the Bishop or the Diocese in light of the hierarchical nature of the Episcopal Church, we overrule the Former Parish Leaders' second issue.

In their third, fourth, and fifth issues, the Former Parish Leaders challenge the trial court's declaration that their actions seeking to withdraw Good Shepherd from the Episcopal Church are void and without effect, its finding that Good Shepherd's property is held in trust for the Episcopal Church and the Diocese, and its alleged failure to give effect to the 1982 deed. Each of these complaints stems from the Former Parish Leaders' initial premise that proper application of the neutral-principles approach would necessarily have resulted in a judgment in their favor. Accordingly, we will address these related points together.

### The Trial Court's Judgment Comports With the Neutral-Principles Approach

Although the trial court made no findings of fact or conclusions of law that conclusively establish which approach it adopted, it appears that the trial court did apply neutral

---

Former Parish Leaders cite no competent summary-judgment evidence to the contrary, relying instead on statements in one former vestry member's affidavit that "[t]he Episcopal Church does not have control of the local parishes like other hierarchical churches appear to," that "[t]hey [sic] have no power to assume original jurisdiction over Good Shepherd," and that "they [sic] have no power to decide who is a voting member of Good Shepherd." Such statements, however, are legal conclusions that are insufficient to raise a fact issue within the context of a summary-judgment motion. *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991); *Ellis v. Jansing*, 620 S.W.2d 569, 571 (Tex. 1981); *Gaines v. Hamman*, 358 S.W.3d 557, 563 n.4 (Tex. 1962).

principles in rendering the judgment under review. The judgment itself indicates that the court considered and interpreted a number of the documents contained in the record, as it would have done if it were employing the neutral-principles approach. Specifically, the trial court's declaration that "all real and personal property of the Good Shepherd is held in trust for the Episcopal Church and the Diocese" is evidence that the trial court looked to the deed conveying the real property to Good Shepherd, the trust provisions contained in the various Canons of the Episcopal Church and the Diocese, and the governing documents of Good Shepherd.

On this record, we likewise conclude that neutral principles of law mandate that the Episcopal Church and the Diocese, not the Good Shepherd parish, have control of the property in question. Though the deed to the property is held in Good Shepherd's name, the parish agreed from its inception to be a part of the greater Episcopal Church and to be bound by its governing documents. These governing documents make clear that church property is held in trust for the Episcopal Church and may be subject to Good Shepherd's authority only so long as Good Shepherd remains a part of and subject to the Episcopal Church and its Constitution and Canons.

### *Alternatively, the Trial Court Properly Applied* Watson *Deference*

Viewed differently, this case can be decided not on the basis of neutral principles of real property or trust law, but by deciding which faction represents the divided local parish. There is no question that the "Good Shepherd Episcopal Church" holds record title to the church property. That is the fact on which the Former Parish Leaders rely most heavily in claiming the right to control and use the property for the new Good Shepherd Anglican church. It does not, however, resolve the ownership dispute, as both the Former Parish Leaders and the Continuing Parish Leaders purport to

18

represent "Good Shepherd." And the Former Parish Leaders' contention that the congregation's vote transformed Good Shepherd into an Anglican parish overlooks the fact that Good Shepherd remains an entity that is recognized by the Episcopal Church and that it continues to assert ownership of the church property held in its name.

Thus, the essence of the dispute before us can be seen as an inherently ecclesiastical question: which parishioners—the loyal Episcopalian minority or the breakaway Anglican majority—represent Good Shepherd, in whose name the disputed property is held? It is not within the jurisdiction of this Court to decide such an issue, which is inextricably linked with matters of church discipline, membership, and faith. Instead, we are bound by the decisions of the highest church judicatories within the Episcopal Church hierarchy to which the matter has been carried. *See Brown*, 116 S.W. at 363 (citing *Watson*, 80 U.S. at 727). Bishop Ohl, who serves as the "chief executive officer" in charge of both "ecclesiastical and temporal issues" and who is therefore the highest ecclesiastical authority within the Episcopal Church hierarchy that governs the Diocese, has determined that the Former Parish Leaders are not entitled to consider themselves members of Good Shepherd or to control property held in Good Shepherd's name. *See Patton v. Jones*, 212 S.W.3d 541, 548 (Tex. App.—Austin 2006, pet. denied) (review of ecclesiastical decisions, "*particularly those pertaining to the membership*[,] are in themselves an 'extensive inquiry' into religious law and practice, and therefore, forbidden by the First Amendment" (quoting *Abrams v. Watchtower Bible & Tract Society*, 715 N.E.2d 798, 803 (Ill. App. 1999) (emphasis added))). According to Bishop Ohl's affidavit, he has, in his capacity as "Bishop and highest Ecclesiastical authority in the Episcopal Diocese of Northwest Texas, . . . recognize[d] the new vestry as the true

19

and proper representatives of the Episcopal Church of the Good Shepherd." Because we are bound by this pronouncement, we hold that the summary-judgment evidence conclusively establishes that the church property at issue is subject to possession and control by the Continuing Parish Leaders of Good Shepherd and the parishioners aligned with them.[7]

## Partial Conclusion

As demonstrated by the foregoing, the trial court's judgment can be affirmed whether we decide this appeal by applying neutral principles of law or by deferring resolution of the determinative question of identity to the proper authorities within the Episcopal Church hierarchy. *See Milivojevich*, 426 U.S. at 709; *Westbrook*, 231 S.W.3d at 398. Under either methodology, giving due deference to the Diocese's resolution of the ecclesiastical questions bearing on this appeal, we

---

[7] We note that this holding is consistent with earlier decisions of this Court and other Texas courts, wherein possession of church property is awarded to the members of a divided hierarchical congregation who remain loyal to the church, while "those members who renounce their allegiance to the church lose any rights in the property involved." *Green v. Westgate Apostolic Church*, 808 S.W.2d 547, 552 (Tex. App.—Austin 1991, writ denied); *see Brown v. Clark*, 116 S.W. 360, 365 (Tex. 1909) (property belonged to congregation that remained loyal to merged, general church); *Schismatic & Purported Casa Linda Presbyterian Church v. Grace Union Presbytery, Inc.*, 710 S.W.2d 700, 706-07 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (Texas law recognizes denominational church's decision that loyal group is true representative of church; therefore, loyal group is entitled to possession and use of all church property); *Browning v. Burton*, 273 S.W.2d 131, 134 (Tex. Civ. App.—Austin 1954, writ ref'd n.r.e.) ("Appellants of course had the right to withdraw from the local church but in so doing they relinquished their rights in the abandoned church."). These courts have viewed the matter as "a simple question of identity" determined by identifying which faction is the successor to the general church as it existed prior to the division. *Presbytery of the Covenant v. First Presbyterian Church*, 552 S.W.2d 865, 871 (Tex. Civ. App.—Texarkana 1977, no writ) (collecting cases). The Former Parish Leaders maintain that the "question of identity rule" is not applicable to this case because the Episcopal Church is not sufficiently hierarchical and lacks the tribunals necessary to decide identity. Having already determined that the record conclusively establishes the hierarchical nature of the Episcopal Church and the Diocese, we reject these arguments.

conclude that when the Former Parish Leaders and the other parishioners aligned with them disaffiliated from the Episcopal Church, the church property remained under the authority and control of the Episcopal Church. Accordingly, the vote to disaffiliate was effective only as to those members who sought to withdraw from the Episcopal Church; it did not have the effect of withdrawing Good Shepherd itself from its union with the Episcopal Church, as the Former Parish Leaders presume.[8] Further, having found that the Continuing Parish Leaders are entitled to possession and use of the property, the trial court did not err in declaring that property owned by the local Episcopal parish is held in trust for the Episcopal Church, pursuant to the Episcopal Church Constitution and Canons. We overrule the Former Parish Leaders' third, fourth, and fifth issues.

### The Former Parish Leaders' Remaining Issues

In their sixth issue, the Former Parish Leaders argue that the trial court's judgment declaring that the church property may be used only for the mission of the Episcopal Church violates the First Amendment of the U.S. Constitution by entangling the court in determining the religious question of the mission of the Episcopal Church. Because it is unsupported by any authorities or citations to the record, this issue is waived. *See* Tex. R. App. P. 38.1(i); *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010). Even if it were not, however, the trial court's judgment passes constitutional muster by deferring to ecclesiastical authorities within the

---

[8] Contrary to the Former Parish Leaders' assertions, the trial court's judgment imposes no violation of the First Amendment's right of free association. The question to be resolved is not whether the defecting parishioners have a right to withdraw from the Episcopal Church and instead join the Anglican Communion—they clearly do—but whether they can claim title to property belonging to the Good Shepherd parish, which, as the trial court properly determined, they cannot.

21

Episcopal Church to define the Church's mission. The Former Parish Leaders also contend that the judgment violates the Texas Constitution by ordering that they may not use, divert, or alienate the real property of Good Shepherd, which constitutes a taking of private property. Given both the failure of any governmental appropriation of the property and the fact that the property is owned by Good Shepherd—not the parishioners who disaffiliated from it—this argument lacks merit. We overrule the Former Parish Leaders' sixth issue.

In their seventh issue, the Former Parish Leaders argue that the order granting summary judgment in favor of the Diocese and the Continuing Parish Leaders is defective because it fails to identify the property and awards the property to persons not named as parties to the suit (namely, the vestry of the Episcopal Church of the Good Shepherd). Again, because they have failed to adequately brief this issue by including authorities or citations to the record, it is waived. *See id.* Moreover, there is no serious question that the subject property is sufficiently identified in the Diocese and Continuing Parish Leaders' motion for summary judgment, which was granted in its entirety as to those claims. In addition, because it is not necessary that all members of the current vestry of Good Shepherd be identified, those who are, including the priest-in-charge and the wardens, can appropriately take possession of the property in accordance with the trial court's order. We overrule the Former Parish Leaders' seventh issue.

**CONCLUSION**

Having overruled the Former Parish Leaders' issues on appeal, we affirm the trial court's judgment.

22

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed:   March 16, 2011